UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

VIVIAN C.,

                                    Plaintiff,

v.

MARTIN O'MALLEY, Commissioner of
Social Security,

                                    Defendant.

Case No.:  3:24-cv-00939-GPC

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND REMANDING
FOR AN AWARD OF BENEFITS**

**[Dkt. No. 15.]**

On May 29, 2024, Plaintiff Vivian C. ("Plaintiff") filed this action seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). (Dkt. No. 1, Compl.)  Plaintiff filed a motion for summary judgment.  (Dkt. No. 15.) Defendant then filed a response to Plaintiff's motion for summary judgement.  (Dkt. No. 16.)  Plaintiff filed a reply to Defendant's response.  (Dkt. No. 18.)  Having reviewed the parties' arguments, the record, and the applicable law, the Court GRANTS Plaintiff's motion for summary judgment, and REMANDS the case for an immediate award of benefits.

/ / /

/ / /

## LEGAL STANDARD

### I.      Standard of Review of Commissioner's Final Decision

Section 205(g) of the Social Security Act ("the Act") permits unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. § 405(g).  The reviewing court may enter a judgment affirming, modifying, or reversing the Commissioner's decision, and may also remand the matter to the Commissioner of Social Security for further proceedings.  *Id.*

The scope of the reviewing court is limited; it may only "set aside the ALJ's[1] denial of benefits . . . when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (internal quotations omitted).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  However, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

### II.     Determination of Disability

For the purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant meets this definition, the ALJ employs a five-step sequential evaluation.  20 C.F.R. § 404.1520(a).  If the ALJ determines that a claimant is either disabled or not disabled at a step in the process, the

---

[1] Administrative Law Judge

ALJ does not continue to the next step. *See* 20 C.F.R. § 404.1520(a); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). In brief, the ALJ considers whether the claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe, medically determinable physical or mental impairment . . . or a combination of impairments that is severe" and that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(i)-(v). Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC. *See* 20 C.F.R. § 404.1520(e); *Bray*, 554 F.3d at 1222–23; *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222.

## **BACKGROUND**

### I. **Procedural History**

On September 22, 2012[2], Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Administrative Record ("AR") 241–42.) Plaintiff alleges she became unable to work due to her disability on July 1, 2008. (*Id.*) Plaintiff's application was denied initially and upon reconsideration. (AR 108–11, 114–18.) On May 6, 2013, Plaintiff filed a request for a hearing before an ALJ. (AR 120–21, 140.) ALJ Mason D. Harrell, Jr. ("first ALJ") held a video hearing on February 3, 2014. (AR 860-886.) On February 14, 2014, the first ALJ issued an unfavorable decision finding that Plaintiff was not disabled under the Act through December 31, 2012, the date last insured. (AR 83–93.) Plaintiff then requested the

---

[2] Plaintiff and the third ALJ state that Plaintiff filed her application for DIB on September 21, 2012. (AR 899.) However, her DIB application indicates that it was filed on September 22, 2012. (AR 241–42.)

Appeals Council to review the ALJ's decision. (AR 170.) The Appeals Council vacated the decision and remanded the case to the ALJ. (AR 98–102.) A second hearing before a different ALJ, Eric V. Benham, ("second ALJ") was held on August 29, 2017. (AR 210). On February 26, 2018, the second ALJ issued an unfavorable decision finding that Plaintiff was not disabled through her date last insured, December 31, 2012. (AR 15–22.) Plaintiff's second request for review was denied by the Appeals Council, making the second ALJ's decision final. (AR 1–5.)

On February 6, 2019, Plaintiff filed a complaint to this Court for judicial review of the second ALJ's decision pursuant to 42 U.S.C. § 405(g). On September 10, 2021, this Court remanded the case after finding that the second ALJ failed to evaluate medical records from the treating physicians addressing her chronic neck and left upper extremity pain at Kaiser Permanente from October 2009 through September 2010, the relevant time period. (AR 999-1000.) As such, the second ALJ's opinion rejecting the treating physician's opinion in favor of the consultative examiner's opinions was not supported by substantial evidence. (*Id.* at 1000.)

On remand, another hearing was held before the same ALJ, Eric V. Benham, ("third ALJ"), on December 15, 2022. (AR 907-31.) On March 8, 2023, the third ALJ issued an unfavorable decision finding that Plaintiff was not disabled through her date last insured, December 31, 2012. (AR 890-99.) On September 15, 2023, the Appeals Council affirmed the decision. (AR 1130-37.) On May 29, 2024, Plaintiff filed a complaint to this Court for judicial review of the ALJ's final decision pursuant to 42 U.S.C. §405(g). (Dkt. No. 1, Compl.)

## II.    Medical History

### A.    Treating Physicians' Medical Records

The earliest medical records in the AR date back to September 13, 2000, when Plaintiff was diagnosed with bilateral wrist tendonitis and early ganglion cysts and was examined by Dr. Jonathan Greenberger and Dr. Nusrt Rajput of Occupational Medicine Resource Center approximately every two weeks until November 20, 2000. (AR 425–

453.)  Dr. Rajput prescribed Naprosyn and physical therapy, and instructed modified work, specifically restricting the use of tweezers and air tools with Plaintiff's left hand. (*Id.*)  On November 21, 2000, Dr. Rajput referred Plaintiff to Dr. Greg Balourdas, M.D., an orthopedic hand specialist, for evaluation and treatment.  (AR 417, 423.)

Dr. Balourdas initially examined Plaintiff on November 29, 2000.  (AR 416–19.) Upon physical examination, he observed a "suggestion of fullness over the left dorsal wrist, without a distinct ganglion," and "slight tenderness over the extensor forearm and the trapezial musculature, with full forearm, elbow, and shoulder range of motion."  (AR 418.)  Dr. Balourdas assessed that the symptoms of Plaintiff's right extremity had been resolved, but observed "residual evidence of a possible tendinitis, ganglion cyst and associate ligament laxity at the scapholunate interval."  (*Id.*)  He prescribed an MRI scan to rule out a ligament injury or the presence of a ganglion.  (AR 419.)  He instructed Plaintiff to continue her medication and use a splint and to be on modified duty.  (AR 416, 419.)  On January 16, 2001, the MRI scan of the left wrist revealed that Plaintiff had a "trace amount of fluid within the dorsal aspect of the radiocarpal joint space" but no ganglion cyst or ligament injury was found.  (AR 420.)

On February 1, 2001, Dr. Balourdas reexamined Plaintiff and noted she had returned to full duty.  (AR 415.)  He observed that Plaintiff was "feeling better" with "less pain," "less tingling in tips" but still "painful with weight bearing through extended wrist."  (*Id.*)  Six weeks after returning to full duty, on March 19, 2001, Dr. Balourdas noted "minimal residual dorsal wrist swelling, without a distinct ganglion" with full range of motion of the left hand, wrist and forearm with some "discomfort over the dorsal wrist at the end of full extension."  (AR 412.)  She discontinued taking Naprosyn about two weeks ago and had no increase in symptoms since discontinuing her medication. (*Id.*)  Her grip strength was in the normal range from 54 to 56 on the right hand and 41 to 60 on the left hand.  (AR 413.)  Dr. Balourdas concluded that Plaintiff "has no work preclusions and is capable of performing her usual work and of competing in the open labor market without limitations."  (*Id.*)

Approximately five years later, on July 24, 2006, because Plaintiff's left wrist symptoms worsened, she was seen again by Dr. Balourdas. (AR 530–36.) She complained of "numbness over the dorsum of the hand and radiating proximally to the trapezial musculature" describing the pain as "burning." (AR 531.) She stated she drops objects, and her symptoms increase at night. (*Id.*) She also stopped working two weeks prior. (*Id.*) Upon physical examination, Dr. Balourdas found remarkable swelling over the dorsal left wrist, and "tenderness to palpation at the site of the cyst as well as over the extensor forearm and into the lateral elbow." (AR 532.) She had full range of motion of the shoulder, elbow, forearm, and wrist. (*Id.*) He assessed that Plaintiff suffers from "local symptoms probably related to a dorsal wrist ganglion." (*Id.*) He concluded that he would "first focus on the dorsal wrist ganglion" and request electrodiagnostic studies due to Plaintiff's subjective complaints which sounded more neurogenic in origin. (AR 533.) Dr. Balourdas also opined that it was unlikely for Plaintiff to "experience significant permanent impairment at the conclusion of treatment." (*Id.*) Dr. Balourdas saw her again on August 2, 2006, and September 14, 2006, with no change in her condition. (AR 527, 529.) Dr. Balourdas placed her on total temporary disability from July 24, 2006 to August 24, 2006. (AR 528, 533, 536.)

On September 19, 2006, Dr. Balourdas performed an excision of Plaintiff's left dorsal wrist ganglion. (AR 525–26.) Following the operation, from September 21 to December 18, 2006, Plaintiff was routinely seen by Dr. Balourdas. (AR 519–524.) According to Dr. Balourdas' observation, Plaintiff initially improved as expected, (AR 521, 523, 524), but then improved slower than expected. (AR 519, 520, 522.) One month post-op, on October 19, 2006, it was noted that Plaintiff did not attend physical therapy due to lack of communication and was discouraged because of the persistent mass and discomfort. (AR 522.) At that time, Dr. Balourdas' objective findings noted thickened scar at the surgical site, tender to palpation, no appreciable fluctuance, no ganglion recurrence, and satisfactory grip strength at this point. (*Id.*) He also noted that Plaintiff may return to work with restrictions including light duty, no gripping or lifting

6

with left hand greater than one to two pounds, and no repetitive lifting, gripping or pinching with left hand. (*Id.*) On November 9, 2006, Plaintiff reported she was doing well with therapy, had not returned to modified work, and still had some thickness and discomfort at the surgical site. (AR 521.) Dr. Balourdas noted scar softening and near full range of motion and no discomfort with grip effort. (*Id.*) Restrictions on return of work were modified to light duty, no gripping or lifting with left hand greater than ten pounds, limit repetitive lifting, gripping or pinching with left hand less than one hour every two hours, four hours in total. (*Id.*) On November 27, 2006, Plaintiff continued improving despite lack of therapy. (AR 520.) She was also taking Daypro to relieve her symptoms. (*Id.*) She had discomfort with wrist extensions and occasional numbness in her fingers and soreness in the trapezial left muscle. (*Id.*) Restrictions on return of work were adjusted to splint to be worn as needed, alternate hand-intensive activities every thirty to sixty minutes, and limit repetitive lifting, gripping or pinching right hand. (*Id.*) On December 18, 2006, Plaintiff reported doing better, taking Daypro, and was able to tolerate more activities without discomfort. (AR 519.) At this time, she was anxious to return to work. (*Id.*) Dr. Balourdas noted that the surgical site was still tender, the scar more supple and range of motion was still limited in flexion. (*Id.*) Restrictions on return of work was "ongoing . . . until release to full duty." (*Id.*)

From January 2007 to May 2007, Dr. Balourdas continued to examine Plaintiff and noted her condition worsened with a full return to work and began using anti-inflammatory and muscle relaxants. (AR 515–18.) On June 14, 2007, Plaintiff continued to experience left upper extremity pain and discomfort with constant pinch and fine manipulation and her level of discomfort was intolerable on busy days. (AR 514.) Dr. Balourdas noted that physical therapy offered some relief, and Plaintiff was assigned to modified duty again with limited constant pinch and fine manipulation on a 15-minute on, 15-minute off schedule and no overtime. (*Id.*) In July 2007, Dr. Balourdas noted that her condition had worsened noting "[p]uzzling activity intolerance" and possible recurrent ganglion but key concerns were myofascial dysfunction proximally. (AR 513.)

7

At the next visit on August 9, 2007, Dr. Balourdas noted that Plaintiff continued to have fullness over the left trapezial muscle and severe pain in left shoulder/trapezial muscle despite having been off work due to unavailability of restricted work.  (AR 512.) Therefore, Dr. Balourdas assessed that further workup was warranted with a cervical spine and shoulder x-ray and an MRI scan and a general orthopedic consultation.  (*Id.*) On August 16, 2007, x-rays revealed a cervical rib which may explain her left upper extremity symptoms.  (AR 511.)  During this period, Dr. Balourdas imposed restrictions on Plaintiff's work activity including light duty, limit fine manipulation and constant pinch to no more than ten minutes every two hours, no repetitive lifting, gripping or pinching with left hand, no gripping or lifting with left hand greater than one to two pounds and no overtime work.  (AR 513-11.)  On September 24, 2007, Dr. Balourdas requested neurologic evaluation due to her cervical rib findings despite normal MRI. (AR 510.)  Restrictions on Plaintiff's work activity remained the same except that minimal gripping or lifting of left hand was increased to three pounds.  (*Id.*)

On October 16, 2007, Richard Ostrup, M.D., examined Plaintiff for a neurosurgical evaluation.  (AR 481–84.)  Dr. Ostrup noted that Plaintiff has a prominent cervical rib on her left, and that "this certainly could be accounting for a component of her problems." (AR 483.)  He opined that Plaintiff should be offered surgical intervention, and if she elects not to proceed with surgery, she should be considered "permanent and stationary with restrictions" including "minimal repetitive activity and no activity sustained at or above shoulder level."  (*Id.*)  Due to the unclear surgical outcome, Plaintiff was anxious and declined surgery.  (AR 482, 509.)

On November 1, 2007, Dr. Balourdas examined Plaintiff after she was seen by Dr. Richard Ostrup.  (AR 509.)  Dr. Balourdas noted that Plaintiff "appears to have a recurrence of her left dorsal wrist ganglion."  (AR 509.)  On the same day, he wrote a Comprehensive Hand and Upper Extremity Evaluation, Permanent and Stationary Report, (AR 504-08), stating Plaintiff "suffers impairment in strength . . . related to discomfort involving the left upper extremity with both recurrent ganglion cyst and

probable thoracic outlet syndrome diagnoses." (AR 506.) Based on the medical records and the physical examination, including the Jamar dynamometer II grip strength result (right 64, left 26) dated July 9, 2007, he assessed Plaintiff's condition to be "permanent and stationary" and her modified duty should now be permanent. (AR 505–06.) He explained given her condition, her normal grip strength would be in the range of 45 pounds and calculating of strength loss index based on her grip strength of 26 pounds results in an upper extremity impairment of 20%. (AR 506-07.) He assessed Plaintiff "should avoid tasks which require fine manipulation and dexterity, or constant pinch limited to no more than 15 minutes every two hours with the left hand. She should limit repetitive lifting, gripping or pinching with the left hand to no more than 15 minutes out of every hour. On the left, she should avoid repetitively gripping or lifting anything greater than 5 pounds." (AR 506.)

On January 10, 2008, Dr. Balourdas examined Plaintiff for the final time and provided a Final Report Addendum based on the physical examination of grip strength and range of motion. (AR 500.) Plaintiff's grip strength was again assessed (right 50-58, left 32-36). (*Id.*) He opined that Plaintiff suffers impairment and has functional deficit and noted that grip strength is not precluded from the AMA Guides as a source of impairment. (*Id.*) On June 16, 2008, Dr. Balourdas filled out the Attending Physician's Statement of Impairment and Function and limited Plaintiff to lift or carry less than 50 pounds occasionally with only occasional reaching above shoulders, handling, fingering and feeling. (AR 540.) However, on July 23, 2008, Dr. Balourdas filled out the same form limited Plaintiff to lift or carry less than 10 pounds, and specifically for the left hand limited her to lift and carry less than 3 pounds occasionally. (AR 538.)

From October 7, 2009, through September 9, 2010, Plaintiff was treated at Kaiser Permanente for shoulder and neck pain. (*See e.g.*, AR 600-03, 637-69.) On October 7, 2009, Plaintiff was seen at Kaiser by her primary care physician, Dr. Mary Grehian Yoo, M.D., for shoulder pain. (AR 667.) She reported that taking Alleve twice daily was not helping. (*Id.*) At that visit, Dr. Yoo referred Plaintiff to radiology for MRIs of the neck

and lower back, physical therapy for neck and back, neurology for arm numbness and physical medicine for possible injection of the back.  (AR 662, 670.)  Plaintiff was also prescribed nortriptyline and ibuprofen.  (AR 669.)

Plaintiff began physical therapy on October 16, 2009 to address her neck and left arm pain with numbness that she reported worsened in the past three months.  (AR 658-59.)  From October 16, 2009, through January 15, 2010, Plaintiff engaged in physical therapy for shoulder pain.  (AR 636–38, 640–42, 646–50, 657–61.)

On October 26, 2009, Plaintiff was seen by Dr. Yvonne Marie Aube, M.D. for a physical medicine and rehabilitation consult.  (AR 653.)  Plaintiff complained of left shoulder and arm pain the past six to seven years.  (Id.)  She reported the pain is sharp and achy, constant and getting worse.  (Id.)  She was taking ibuprofen and nortriptyline.  (Id.)  A physical examination showed tenderness to palpation of the left upper trapezius and subacromial bursa and "upper extremity range of motion WNL except spinal stenosis left shoulder abduction and internal rotation slightly decreased and painful."  (AR 655.)  The physical exam also revealed that neer impingement sign mildly positive on left; motor strength normal with no muscle atrophy; sensation is intact to light touch in all extremities except diffusely decreased in left upper extremity.  (AR 655-56.)  The tinel's sign was positive on the left carpal tunnel.  (AR 656.)  Dr. Aube diagnosed Plaintiff with myofascial neck pain, left upper extremity pain and mild left shoulder impingement.  (AR 657.)   She was told to continue nortriptyline, discontinue ibuprofen, and to try meloxicam and robaxin and return in 4 weeks.  (Id.)

Plaintiff was also seen by a neurologist, Linda Jeannette Jaffe, M.D. on November 3, 2009.  (AR 652.)  After neurological testing, Dr. Jaffe opined that she does not have carpel tunnel syndrome that would affect her left upper extremity and suspects myofascial pain syndrome.  (Id.)

On October 29, 2009, Plaintiff had an MRI of the cervical spine, which showed minimal spondylotic or degenerative changes at multiple levels.  (AR 651, 752-53.)  It was opined that her MRI was normal for her age and not responsible for her symptoms

1  and they appear to be due to muscle pains which is called myofascial pain syndrome and

2  treatment involves physical therapy, medications, trigger point injections, acupuncture,

3  improving sleep quality and treating anxiety and depression.  (AR 651.)

4    On December 7, 2009, Plaintiff had a follow up visit with Dr. Aube.  (AR 643-45.)

5  It was noted that she discontinued use of meloxicam because it did not help her, she goes

6  to physical therapy, her left wrist splint helped a little, the MRI C spine showed mild

7  diffuse spondylosis, MRI LS spine showed normal lumbar spine, and NCS by neurology

8  showed no carpal tunnels syndrome.  (AR 644.)  At this visit, Plaintiff requested trigger

9  point injection.  (AR 644.)  Dr. Aube diagnosed Plaintiff with myofascial pain syndrome

10  (neck, left shoulder girdle), rotator cuff syndrome (left shoulder impingement), and

11  spondylosis cervical joint without myelopathy (neck and left upper extremity pain X

12  years).  (AR 645.)  She was treated with "trigger point injection of the left upper

13  trapezius."  (*Id.*)  The plan was to continue physical therapy and return in 3-4 weeks.  (*Id.*)

14    On January 5, 2010, on a follow up visit, Dr. Aube, Plaintiff reported that the

15  trigger point injection from the last visit improved her pain from an 8 out of 10 to a 4 out

16  of 10 with 1-2 out of 10 being an acceptable pain level for her.  (AR 639-40.)  On

17  examination, her left upper trapezius was mildly tender to palpation, no shoulder girdle

18  weakness, resisted shoulder abduction painful and neer impingement sign positive.  (AR

19  639.)   Plaintiff received another trigger point injection of the left subacromial space.

20  (*Id.*)  The plan was to continue physical therapy and return in 2-3 week and if pain

21  persist, Dr. Aube anticipated MRI of the left shoulder and ortho consult.  (AR 640.)

22    On September 9, 2010, on a visit with Dr. Yoo, Plaintiff reported doing well, that

23  nortriptyline helped with her myofascial pain and she would like to try acupuncture.  (AR

24  600.)  Dr. Yoo noted her myofascial pain syndrome was stable and unchanged.  (AR

25  602.)  She was prescribed nortriptyline and referred to acupuncture.  (AR 603.)

26    **B.**    **Examining State Agency Consultants**

27    On November 17, 2008, an orthopedic consultation was performed on Plaintiff by

28  Thomas J. Sabourin, M.D., the consultative examiner.  (AR 559–63.)  During the

examination, Dr. Sabourin found that Plaintiff had full range of motion of both shoulders but had pain over the trapezius muscle with shoulder range of motion. (AR 561.) However, there was no tenderness over the shoulder or the scapula and provocative test was negative. (*Id.*) Plaintiff had full range of motion of her elbows, no instability in her wrists and normal range of motion of her hands and fingers. (*Id.*) Her grip strength by Jamar Dynamometer on her right hand ranged from 55-60, and the grip strength on her left hand ranged from 35-40. (AR 560.) In his review, Dr. Sabourin noted that there were no x-rays available and no medical records available except Dr. Balourdas's final report dated January 10, 2008. (AR 562.) Dr. Sabourin concluded that Plaintiff "could only lift or carry 50 pounds occasionally and 25 pounds frequently," "could stand and walk six hours of an eight-hour workday and sit for six hours of an eight-hour workday," "has no posture limitations," "has manipulative limitations," and that she could "work with the left arm above the shoulder level only occasionally." (AR 563.) He also noted that "the left wrist ganglion excision is inconsequential" and that he feels she has "no gross or fine manipulation, as she has no need for assistive devices." (*Id.*)

On November 19, 2012, Dr. Sabourin performed a second orthopedic consultation on Plaintiff. (AR 767-71.) Plaintiff "complain[ed] of a throbbing pain with any sitting or standing in the neck and left trapezius muscle" and used a "left wrist brace for driving and at night" due to pain in her left arm but noted she did not wear the wrist splint for the exam. (AR 767.) Examination revealed that although Plaintiff had normal range of motion of the shoulders, elbows, wrists, hands, and fingers, the range of motion of the left shoulder was not as complete as on the right in abduction. (AR 769.) Her right grip strength ranged from 50-56 and her left grip strength ranged from 22-25. (AR 768.) Despite her weak grip strength, Dr. Sabourin concluded that she had normal motor strength throughout the upper and lower extremities bilaterally. (AR 770.) Dr. Sabourin also concluded that Plaintiff "has non-anatomical numbness in the left arm, but otherwise her findings are relatively normal" and that although the "range of motion for her left shoulder is slightly less than that of the right, [it] is slightly better than . . . normal for

Social Security purposes." (AR 771.)  In addition, he noted she has pain syndrome likely related to the excision of a tumor on that side.  (*Id.*)  Based on the evaluation, he came to his same conclusion and assessed that Plaintiff "could lift or carry 50 pounds occasionally and 25 pounds frequently," "could stand and walk six hours of an eight-hour workday and sit for six hours of an eight-hour workday," "has no postural limitation," "has manipulative limitations," and that she could "work with the left arm above the shoulder level only occasionally." (*Id.*)

## C. Non-Examining State Agency Consultants

On December 13, 2012, R. Masters, M.D. reviewed Plaintiff's DIB claim.  (AR 54–66.)  Dr. Masters found Plaintiff was not disabled and that "[m]edium RFC with [left upper extremity] limits" to be appropriate.  (AR 61, 65.)  He found Plaintiff to be capable of lifting/carrying fifty pounds occasionally and twenty-five pounds frequently, stand/walk or sit for six hours in an eight-hour workday, and have manipulative limitations when reaching overhead with her left upper extremity but no limitations as to gross and fine manipulations.  (AR 63–64.)  He concluded that while Plaintiff's condition "results in some limitations in [her] ability to perform work related activities," the limitations do not prevent her from past work in electronics quality assurance.  (AR 65.)  Further, he noted that her condition was not severe enough to keep her from working.  (AR 65–66.)

On April 12, 2013, V. Michelotti, M.D. reviewed Plaintiff's DIB claim.  (AR 67–79.)  Dr. Michelotti found that Plaintiff could lift/carry fifty pounds occasionally and twenty-five pounds frequently, stand/walk and sit for about six hours in an eight-hour workday, and had postural limitations due to chronic left shoulder and wrist pain.  (AR 76.)  She also had limited limitations of reaching overhead with her left upper extremity which she could do occasionally.  (AR 77.)  He concluded that Plaintiff was not disabled and had the RFC to perform her previous work in electronic quality assurance.  (AR 78.)

## D. Medical Expert Testimony

At the hearing on December 15, 2022, Dr. Michael Hartsfield, M.D. testified as the medical expert. (AR 896.) Based on a review of Plaintiff's medical records, Dr. Hartsfield identified two severe medical impairments during the period from July 1, 2008 to December 31, 2012: (1) myofascial pain syndrome caused by shoulder lesion removal from the left side of her neck; and (2) substantial issues after dorsal ganglion cyst removal from her left wrist. (AR 911.) Based on her medical condition, he "believe[d] she can lift and carry 10 pounds frequently and 20 pounds occasionally," and sit, stand and walk two hours at a time in six hours in an eight-hour day. (AR 912). He did not think Plaintiff is truly ambidextrous because "[s]he basically does everything left-handed except . . . write her name and perhaps eat."[3] (*Id.*) He recognized that her real issues and limitations are the use of her hands, including her shoulder. (*Id.*) He opined that her left hand is limited to occasional reaching overhead, handling, fingering and feeling. (*Id.* at 912-14.) He noted that the Jamar grip test result in January 10, 2008, by Dr. Balourdas, showed weaker grip strength of the left hand than normal, and questioned whether her left hand's grip strength was truly normal as described by Dr. Sabourin's opinion in 2012. (AR 913.) He also opined that Plaintiff can frequently climb stairs at ramps, but not ladders or scaffolds. (*Id.*) She can balance, stoop, kneel frequently and crouch occasionally but not crawl. (*Id.*) Occasional means up to a third or 2.2 hours and 45 minutes of an eight-hour day. (*Id.* at 915.) As to lifting, she can lift up to 20 pounds

---

[3] Plaintiff testified at the first ALJ hearing that she was right-handed. She then clarified that she used her left hands for all activities at her job but could no longer do anything with her left hand by the time she testified, and she started using her right hand for eating and signing her name. (AR 869, AR 881.) Plaintiff's husband testified that his wife was left-handed and that she was confused by the question when she initially answered to be right-handed. (AR 880.) Plaintiff testified she is left hand dominant in the second ALJ's hearing. (AR 37.) However, the Court notes that Dr. Balourdas had made contradictory findings by sometimes noting that Plaintiff was right-handed, (AR 413, AR 522), and other times left-handed. (AR 531.) The Kaiser Permanente records also states Plaintiff was right-handed. (AR 659.) The Court notes that Plaintiff came from Philippines and has limited capabilities to understand and speak English, which may have caused these contradictory findings. (AR 34, 863-866.) Based on the record, it appears that Plaintiff is left-hand dominant and due to her symptoms, she uses her right hand to compensate.

using both hands occasionally.  (AR 914.)  When asked, Dr. Hartsfield stated she cannot work on a conveyor belt or anything repetitive and use industrial tools occasionally and would need to change positions after two hours.  (AR 916-17.)  As to medications, Dr. Hartsfield only noted Dr. Sabourin's prescription of occasional ibuprofen, Tylenol or Aleve acknowledging there may be more but that was all he was aware of.  (AR 917.)  He acknowledged that Plaintiff reported constant pain with Dr. Aube.  (AR 917.)

## III.  Third ALJ Decision

At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity during the period from her alleged onset date of July 1, 2008, to her date last insured of December 31, 2012.  (AR 892.)  At step two, ALJ found her severe impairments included "left wrist pain, status post excision of ganglion cyst, and myofascial syndrome with neck and left shoulder pain."  (AR 893.)

At step three, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the regulations.  (AR 893.)  Prior to step four, ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 CFR § 404.1567(b)[4] except standing, walking, and sitting could be done for two hours at a time, six hours total in an eight-hour workday; occasional stooping, crouching, kneeling, or climbing stairs; no crawling or climbing ladders or scaffolds; occasional handling, fingering, or feeling with the left upper extremity.  (AR 893.)  At step four, he determined that Plaintiff was not capable of performing past relevant work, but she could perform the requirements of a

---

[4] "(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

counter clerk, usher, and furniture rental clerk.  (AR 897-99.)  The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date, July 1, 2008, through the date last insured, December 31, 2012.  (AR 899.)

## DISCUSSION

## I    Weight of Medical Evidence

Plaintiff contends that the ALJ's decision failed to weigh the medical evidence in accordance with the applicable pre-2017 regulations, which requires giving controlling weight for a treating doctor's opinion over a non-treating doctor's opinion unless he provides specific and legitimate reasons for not doing so.  (Dkt. No. 15-1 at 4.[5])  Further, to the extent the ALJ failed to give controlling weight to the treating doctor, the ALJ also failed to conduct the six factor analysis under 20 C.F.R. § 404.1527(c)(2).  (*Id.* at 4, 6.) In response, Defendant argues that the ALJ's opinion was consistent with the pre-2017 regulations and complied with the Court's remand order by providing specific and legitimate reasons for rejecting Dr. Balourdas' opinions.  (Dkt. No. 16 at 3-6.)

Because Plaintiff's claim was filed prior to March 27, 2017, the Court applies the pre-2017 regulations for reviewing medical evidence as it did in its prior order.  *See Farlow v. Kijakazi*, 53 F.4th 485, 488 & n.3 (9th Cir. 2022) (applying pre-2017 regulations for the plaintiff's claim filed before March 27 2017).  An ALJ is obligated to take into account all medical opinions of record.  20 C.F.R. § 404.1527(c).  Generally, a treating physician's opinion is entitled to more weight than an examining physician's opinion, and more weight is given to an examining physician's opinion than a non-examining physician's opinion.  *Garrison*, 759 F.3d at 1012.  A treating physician's opinion is "given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  *Trevizo v. Berryhill*, 871 F.3d

---

[5] Page numbers are based on the CM/ECF pagination.

664, 675 (9th Cir. 2017) (internal quotation marks omitted) (citing 20 C.F.R. § 404.1527(c)(2)).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Ryan*, 528 F.3d at 1198). When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must consider factors such as "length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion." *Trevizo*, 871 F.3d at 676 (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Other factors include consistency, specialization of the physician, and other factors such as the extent the physician understands the social security disability programs and their evidentiary requirements and the extent to which a medical source is familiar with the other information in the case. 20 C.F.R. § 404.1527(c)(4)-(6). Failure to consider any of these factors "constitutes reversible legal error." *Trevizo,* 871 F.3d at 676.

The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). "The ALJ . . . must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).

In the prior order, the Court found that because the second ALJ stated that Plaintiff received no treatment for her shoulder injury from August 2007 to November 2012, the "second ALJ ignored and failed to consider Plaintiff's treating physicians treating her chronic neck and left upper extremity pain at Kaiser Permanente from October 2009 through September 2010, the time relevant to determining Plaintiff's disability." (Dkt.

No. 27 at 22-23.)  Further, the Court observed that the second ALJ noted she was only taking ibuprofen three times a week and ignored the records showing that Plaintiff was taking nortriptyline, went to physical therapy and received trigger point injections.  (*Id.* at 23.)  For those reasons, the Court concluded that the second ALJ improperly rejected the treating physician's opinion in favor of the consultative examiner's opinions.  (*Id.*)

Upon remand and holding another hearing, the ALJ gave "great weight" to the opinion of Dr. Hartsfield, the non-examining medical expert, and gave partial weight to the opinion of Dr. Balourdas, Plaintiff's treating hand specialist from November 29, 2000 to January 10, 2008.  (AR 896.)  The ALJ explained that Dr. Hartsfield had the advantage of reviewing the entire record, is a board-certified orthopedic surgeon, understands the social security disability programs and evidentiary requirements, and his opinion was supported by objective evidence.[6]  (AR 896.)  On the other hand, the ALJ, relying on Dr. Dr. Balourdas' Attending Physician's Statement of Impairment and Function dated June 16, 2008, (AR 540), gave his opinion partial weight because he "insufficiently limits occasional lifting and excessively limits frequent lifting."  (AR 896.)

The Court concludes that the ALJ committed clear error by failing to provide specific and legitimate reasons that are supported by substantial evidence to reject the treating physician's opinion for several reasons.  First, even though the Court noted that the second ALJ failed to consider the Kaiser Permanente medical records during the relevant time period, October 2009 to January 2010, the third ALJ failed to place any weight or explanation as to her treating physicians' opinions at Kaiser Permanente and their impact on Plaintiff's residual functional capacity.  Instead, the ALJ merely recited a

---

[6] Plaintiff argues that the ALJ failed to reject the treating physician's opinions by considering the factors under 20 C.F.R. § 404.1527(c).  The Court disagrees.  Here, the ALJ considered a few of the factors outlined in 20 C.F.R. § 404.1527(c), such as the physician's specialization, familiarity with the social security disability program and familiarity with Plaintiff's medical record.  Therefore, the ALJ has considered these factors.  *See Kelly v. Berryhill*, 732 Fed. Appx. 558, 562 n.4 (9th Cir. May 1, 2018) (ALJ is not required to state that he considered all the factors as long as there is some "indication" that the factors were considered).

few of her visits without explanation.  (AR 895.)  This failure to place any weight on the treating physicians' opinions and consideration in assessing Plaintiff's residual functional is error.  *See Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) ("the ALJ failed to provide Dr. Johnson's statement *any* degree of review at all, and gave no reasons for doing so, let alone any clear and convincing reasons.").

Second, the ALJ relied solely on the opinion of Dr. Hartsfield, a non-examining orthopedic physician to reject the opinion of Dr. Balourdas, Plaintiff's treating orthopedic hand surgeon.[7]  An ALJ errs by relying solely on a non-examining physician to reject the opinion of the treating physician to support a non-disability finding.  *See Ryan*, 528 F.3d at 1202 (citation omitted) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.").  Furthermore, an ALJ's opinion is not supported by specific, legitimate reasons if the diagnoses of Dr. Hartsfield, a non-examining medical expert, are similar to the diagnoses of treating physicians, Dr. Balourdas and Dr. Aube, but differ only as to their conclusions.  *See Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) ("When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence.").  Here, the diagnoses concerning Plaintiff's left shoulder, arm and hand pain rendered by Dr. Balourdas and Dr. Aube are similar to Dr. Hartsfield.  They differ only as to their conclusions.  As such, the ALJ's reliance on Dr. Hartsfield's opinion to reject the treating physicians' opinions does not constitute specific and legitimate reasons.  *See id.*

Next, in rejecting Dr. Balourdas opinion, the ALJ relied on the Attending Physician's Statement of Impairment and Function dated June 16, 2008, but did not address the Attending Physician's Statement of Impairment and Function dated July 23,

---

[7] In his decision, the ALJ did not give great weight to the examining state agency consultant, Dr. Sabourin and the non-examining state agency consultants, Dr. Masters and Dr. Michelotti.  (AR 897.)

2008 which provided further limitations on Plaintiff's ability to lift with her left hand to less than 3 pounds with no simple grasping, pushing/pulling or fine manipulation and occasional reaching above shoulders, handling, fingering and feeling.  (AR 538.)  The failure to address this report is also error.  *See* 20 C.F.R. § 404.1527(b) ("we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive").

Accordingly, the Court concludes that the ALJ failed to reject the treating physician's opinion with specific and legitimate reasons thereby providing an incomplete residual functional capacity assessment.  *See Hill,* 698 F.3d at 1161.

## II.    Evaluation of Plaintiff's Subjective Testimony

Plaintiff argues that the ALJ failed to reject Plaintiff's subjective symptom testimony with clear and convincing reasons and improperly relied on activities of daily living, or her ability to exercise, to reject her credibility.  (Dkt. No. 15-1 at 11-13.) Defendant contends that the ALJ properly rejected Plaintiff's subjective complaints because medical evidence and her daily activities did not corroborate the severity of symptoms alleged.  (Dkt. No. 16 at 6.)

An ALJ must undergo a two-step analysis to determine whether a claimant's testimony regarding subjective pain and other symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d. 1028, 1035-36 (9th Cir. 2007).  First, the ALJ determines whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotation marks omitted). When the claimant meets the first step and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1281, 1284 (9th Cir. 1996); *see also Reddick*, 157 F.3d at 722 ("[g]eneral findings are insufficient.").  The "specific, clear, and convincing" standard requires the ALJ to

identify which part of the testimony is not credible and contradicts with which evidence. *Lambert v. Saul*, 980 F.3d 1266, 1277-78 (9th Cir. 2020).

Here, at step one, the ALJ found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 894.) At step two, the ALJ did not mention any evidence of malingering, and found that Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent because the objective medical evidence generally does not support the alleged loss of function." (AR 896.) The ALJ explained that even though the "objective evidence of radiographic scans, physical examinations, and medical treatment notes indicate some abnormal findings supporting . . . severe physical conditions," the "physical examinations show normal motor strength throughout the upper and lower extremities bilaterally and normal reflexes" relying on Dr. Sabourin's reports. (AR 896.) He also noted that in March 2009, Plaintiff exercised for 60 minutes, 4 days a week, at a moderate to strenuous level. (AR 895.)

The Court finds that the ALJ failed to articulate "specific, clear, and convincing" reasons for rejecting Plaintiff's subjective complaints by relying on Dr. Sabourin's reports that Plaintiff's physical examination "show[ed] normal motor strength throughout the upper and lower extremities bilaterally and normal reflexes." (AR 896.) First, neither Dr. Sabourin nor the ALJ noted or took into consideration that Plaintiff's left grip strength from November 17, 2008 to November 19, 2012 dropped from 35-40 to 22-25, (AR 560, 768), and raises questions as to whether Plaintiff's motor strength was normal bilaterally. Even Dr. Hartsfield implicitly questioned Dr. Sabourin's conclusion that Plaintiff had normal muscle strength in the upper and lower extremities bilaterally, and concluded that he "can't really say if she has completely normal strength at that point in time." (AR 913.) Next, ALJ does not provide a clear and convincing reasons when he relied on Dr. Sabourin's opinion for purposes of rejecting her subjective pain testimony but later in the decision, discounts Dr. Sabourin's opinions because he failed to consider Plaintiff's complaints of chronic neck and shoulder pain. (AR 896, 897.)

Finally, Plaintiff's ability to exercise in March 2009 does not, by itself, show that Plaintiff's subjective pain testimony should be disregarded.  A review of her medical records reveal that Plaintiff's symptoms as to her left shoulder and left hand were intermittent.  Plaintiff's condition may have been stationary from January 2008, when she last saw Dr. Balourdas, through October 2009 when she sought medical care from Dr. Yoo and Dr. Aube for recurrent neck and pain in her left shoulder, arm and hand.  Therefore, her ability to exercise in March 2009 does not provide a convincing reason why her subjective pain testimony was rejected.  Therefore, based on the questionable nature of the evidence that the ALJ relied on in rejecting Plaintiff's statements, the Court finds that the ALJ failed to provide specific, clear and convincing reasons for rejecting Plaintiff's statement about the severity of her symptoms.

## IV.    Remand for an Award of Benefits Is Appropriate

Plaintiff asks for an award of benefits instead of remand for another hearing due to the extensive delay of almost twelve years and even further delay if the case is remanded to again allow the ALJ to apply the correct legal standard.  (Dkt. No. 15-1 at 14-15.)  Defendant maintains that the Court should remand the case if there was harmful error in the ALJ's analysis but provides no meaningful analysis of why Plaintiff should not be entitled to an award of benefits.  (Dkt. No. 16 at 8-9.)

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017).  The Social Security Act, however, grants district courts flexibility in certain circumstances to reverse the ALJ's decision and remand for an immediate award of benefits rather than further administrative proceedings.  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (recognizing flexibility in § 405(g) "to reverse or modify an administrative decision without remanding the case for further proceedings.").  Under this exception, the district court may remand for an award of benefits if "(1) the record has been fully developed and further administrative proceedings would serve no useful

purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020.

On the first factor, the Court finds that the record has been fully developed since the first ALJ decision on February 26, 2018, and further administrative proceedings would serve no useful purpose in light of the fact that there have already been three administrative hearings. *See Lopez v. Astrue*, 497 F. App'x 717, 719 (9th Cir. 2012) ("Because this case has been remanded twice before, we see no point in giving the Commissioner a fourth opportunity to determine the claimant's eligibility. We reverse and remand for an award of benefits."). Further, Plaintiff applied for benefits thirteen years ago in September 2012, and despite a remand, the third ALJ failed to fully and fairly consider the medical record and Plaintiff's subjective testimony. Allowing the Commissioner to revisit the issue again would create an unfair "'heads we win; tails, let's play again' system of disability benefits adjudication." *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Garrison*, 759 F.3d at 1021-22 (precedent and the purpose of the credit-as-true rule "foreclose[s] the argument that a remand for the purpose of allowing the ALJ to have a mulligan [to revisit the medical opinions and testimony that were improperly rejected] qualifies as a remand for a 'useful purpose' under the . . . credit-as-true analysis.") (citations omitted); *Knorr v. Berryhill,* 254 F. Supp. 3d 1196, 1220 (C.D. Cal. 2017) ("[R]emanding for the ALJ to reconsider this evidence, which the ALJ already had an opportunity to review, would simply be allowing the ALJ to have a second bite at the apple.").

On the second factor, the ALJ, on a second go around, as explained in detail above, failed to provide legally sufficient reasons supported by substantial evidence that Plaintiff is disabled under the Act. The ALJ erred by failing to place any weight on Plaintiff's treating physicians at Kaiser Permanente and by failing to provide reasons why he

rejected the opinions of her treating physician, Dr. Balourdas, and by failing to provide specific, clear, and convincing reasons rejecting Plaintiff's subjective pain testimony.

Finally, on the third factor, the Court concludes that the ALJ would be required to find Plaintiff disabled if the improperly discredited evidence were credited as true. If the Court credited as true Dr. Balourdas' opinion of July 23, 2008, opining that Plaintiff could lift no more than three pounds in her left hand, and could only occasionally reach, handle, finger or feel and could not do simple grasping, pushing/pulling and fine manipulation, (AR 538), and taking into consideration her subjective pain testimony that she must take break every 30 minutes for 5-10 minutes to stretch and massage her left arm as she testified at the hearing, (AR 923), there would be a finding of disability. The vocational expert testified that there would be no work available for a person limited to occasional lifting up to 10 pounds with occasional reaching, handling, and fingering, (AR 938), and testified a person off task by taking breaks for at least 15 minutes every 30 minutes would not be able to sustain full time work. (AR 929.) Therefore, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand.

Accordingly, the Court concludes this is one of those "rare" cases where remand for an award of benefits is warranted because all three factors have been satisfied. *See Treichler*, 775 F.3d at 1103.

## CONCLUSION

Based on the above, the Court **GRANTS** Plaintiff's motion for summary judgment, **REVERSES** the ALJ's decision and **REMANDS** the case to the Commissioner of Social Security for an immediate award of benefits.

IT IS SO ORDERED.

Dated:  September 30, 2025

Hon. Gonzalo P. Curiel
United States District Judge